348 So.2d 689 (1977)
HENICAN JAMES AND CLEVELAND, a partnership
v.
Mrs. Mildred Chiasson, divorced wife of Zachary A. STRATE.
No. 8255.
Court of Appeal of Louisiana, Fourth Circuit.
July 11, 1977.
Rehearing Denied August 1, 1977.
Writ Refused October 26, 1977.
*690 Joseph P. Henican, III, Henican, James & Cleveland, New Orleans, for plaintiff-appellee.
Valerie Fontaine, New Orleans, for defendant-appellant.
Before REDMANN, GULOTTA and BEER, JJ.
REDMANN, Judge.
Plaintiff law firm was discharged by defendant client after two days of trial of an action in federal district court. It was discharged after it wrote defendant a four-page letter which prompted defendant to ask a conference with the judge, at which plaintiff sought to withdraw as counsel but was refused by the judge (who allowed, as a "constitutional" right, defendant to discharge plaintiff). The result was that much of the time that plaintiff spent in preparation for trial and presumably all of the time spent in trial was a complete loss to defendant. Plaintiff nevertheless sued for payment for all time spent at the agreed rate of $50 an hour, and the trial judge gave judgment on that basis.
We conclude that a lawyer who quits a client without reasonable justification in mid-trial is not entitled to be paid for his time which has been made worthless by his quitting; and that the same conclusion applies to a lawyer who is discharged by the client after the lawyer's attempt to quit without reasonable justification is refused by the trial judge.
The agreement by a lawyer to litigate a matter for a client for a fee of an hourly rate is, of its essence, an agreement by the lawyer to litigate the matter to its conclusion (at least to the end of trial). It is not an agreement for the hiring of labor by the hour; the hourly rate merely establishes the fee to be paid for trying the case. The lawyer, unlike the typical hourly wage earner, does not leave all of his valuable work behind him when he quits; he has much of it in his head, undeliverable to the client except by performing his undertaking *691 in its entirety. The bricklayer, on the contrary, howsoever his craftsmanship and art may have required the exercise of his internal faculties, leaves outside of himself at the end of each day a work product that merits his pay for that day's hours. Even a bricklayer who has undertaken to lay the bricks of a whole house (designed by another) for an hourly wage, but who quits prior to its completion, leaves his external product, the partially completed structure, which another competent bricklayer can complete in approximately the same number of hours the first bricklayer would have taken; and if the second can be employed at the same hourly wage, the first's quitting prior to completion of the entire contract would not have caused the owner any excess cost of completion. The quitting bricklayer may therefore be entitled to be paid for all the hours worked because the owner gets full value for all those hours.
Not so the lawyer who undertakes to litigate. His pleadings, memoranda and depositions have real value and can be used by subsequent counsel, but they do not contain all of the product of his hours of work, and subsequent counsel cannot complete the litigation in the same number of hours that first counsel would have taken. The hours that the first lawyer spent familiarizing himself with the evidence and constructing factual and legal contentions must to a large extent be spent again by later counsel; and the hours of an aborted jury trial must be entirely repeated.
We therefore conclude that the lawyer employed on an hourly fee basis to litigate a matter cannot recover on that fee basis when he unjustifiably terminates or gives the client cause reasonably to terminate the employment prior to completion. He can recover only for the enrichment, within La.C.C. 1965, which his services have afforded the client, because otherwise the client would be unjustly enriched.

The Trial Court's Error
The trial judge placed too narrow a construction on the pleadings and adopted the position that defendant's only defense was in the nature of a set-off in the amount of the costs defendant had to pay for the aborted jury trial.
Defendant's answer denied that it owed plaintiff the $9,225.40 claimed, and alleged "plaintiff's representation was terminated because of its failure and refusal to represent petitioner at trial of her case in Federal Court, which refusal to continue to represent Petitioner came after two days of trial, at which time it was impossible for her to obtain further representation and which further obligated her to pay substantial court costs in excess of $8,000, all to respondent's damage and prejudice." (In fact, the testimony indicated, defendant did not have to pay those costs because the order to pay was set aside on appeal.) The trial court, upon reading this wording, ruled that defendant's evidence of the cost of employing another lawyer to try the case was inadmissable: "The answer speaks for itself, and it addresses itself to court costs and not attorney fees and I would have to maintain the objection."
The parties did not request written findings of fact and reasons for judgment as C.C.P. 1917 authorizes. However, it appears from the trial judge's rulings of record that he viewed defendant's answer as accepting liability for the $50 hourly fees and as seeking credit only for costs imposed (when, as it turned out, costs were not imposed on defendant). This view is incorrect because defendant was not asserting an affirmative defense that C.C.P. 1005 required be pleaded; defendant's "negative defense" was but a denial of the alleged indebtedness, and it was therefore plaintiff's burden to prove its allegations, especially when defendant alleged she discharged plaintiff for cause. The substance of defendant's answer is that she denies liability because plaintiff itself breached their contract. "Every pleading shall be so construed as to do substantial justice"; C.C.P. 865. Understandable though the trial judge's construction of the answer be, we conclude that it was erroneous, and that it caused an erroneous judgment.

*692 Plaintiff's Attempted Termination Unjustified

Termination of an attorney-client relationship to the client's prejudice will inevitably raise questions of the propriety of the attorney's action. Termination by the client may also present, in substance, the same questions because the lawyer who unjustifiably provokes the client into a prejudicial termination of the relationship must also be answerable for his action.
Plaintiff did, by its attempted termination during trial, provoke defendant's reasonable reaction of discharging plaintiff. The question is whether plaintiff's behavior was justified.
The beginning of the end was a single-spaced four-page letter by plaintiff through its senior partner, hand-delivered to defendant on the second day of trial, reurging acceptance of a compromise. The letter was written "to preserve certain facts concerning my relationship with you" and its topic paragraph was:
It is still my considered opinion that the best possible way for me to serve you in this case is to reurge your acceptance of the compromise proposal, and I am recording this fact so that at some future date you will not try to blame me, as you have tried to blame me for so many other things, for not having forced you into the compromise.
The letter set forth the partner's initial unwillingness to have defendant as a client even for consultation, except that defendant "pleaded with me . . . to make myself available to you on a consultative basis, and I agreed." The letter recited lack of cooperation by defendant in pursuing her cause, and noted "I know that I have offended you by telling you that in my opinion you are incompetent to make this decision [to compromise or not] on your own; but you insist that it is your case and that you have a right to do whatever you wish with it." On the merits of the compromise plaintiff partner averred that, from his then more knowledgeable evaluation of the case,
It is my considered opinion . . . that you will be lucky to get the settlement that is now being offered you. I have recommended it to you before, since, and right now, and I want it to be plainly understood that if you end up with a serious disappointment in this case, you will have forfeited what I consider to be a very good compromise.
Nor am I prepared to take the full responsibility if the case is not won to your satisfaction.
Plaintiff partner testified that at the time of writing the letter "I had begun to realize that Mrs. Strate was what I considered to be an unstable person, she was highly emotional and she was a difficult client and I had recommended to her what I considered to be a very favorable compromise settlement." He wrote the letter to protect himself against possible charges of malpractice.
The letter provoked defendant into seeking a conference with the federal district judge before whom the jury trial was being conducted. "She wanted a conference and the judge wouldn't give it to her and I sat there with her and Rudy [co-counsel] and she began to abuse me and I said, Mrs. Strate, I am going back to the judge and ask him to give me a release . . . I had no intention of withdrawing from the case until they abused [1] me . . ." The judge called a conference with all counsel "and we went to the conference and she was mad about me writing the letter and I asked the judge to release me from the further trial of the case. . . ."
Although plaintiff's senior partner at one point answered "No, never . . ." to the question whether disagreement over compromise versus trial was the irritant to the attorney-client relationship, he later answered affirmatively to "But, the abuse or the disagreement was the real bone of contention, the fact that she did not want to settle despite your advice, she wanted to go *693 forward with the trial?": "Yes, she accused me of having a negative attitude and I guess it meant that she didn't agree with meI have no objection to you saying it was over a compromise. She was the one that was ugly. I was not the one that was ugly. I was firm, but not ugly. . . ."
The record as a whole creates the unmistakable impression of an irreconcilable disagreement over whether to compromise or try the case. "I thought she needed to have her head examined not to accept that settlement.. . ."
Yet it was not defendant's refusal to accept the settlement, but her request for a conference with the judge concerning plaintiff's mid-trial letter, that provoked plaintiff into asking to withdraw as counsel. A client's direct request for a conference with the judge trying the client's case, however inappropriate, is not justification for the attorney's quitting the client in mid-trial. His attempt to quit, however, especially in the light of his written pessimism over her case, did justify the client's terminating their relationship. Plaintiff did not perform its contract and therefore cannot recover the pay that that contract promised only for performance; plaintiff can only recover on a theory of unjust enrichment.

Unjust Enrichment Quantum
Unjust enrichment quantum in our case is complicated by the circumstance that when first employed, about mid-May of 1973, plaintiff expressly declined to actually try the matter, and was employed only to consult with defendant and to attempt to negotiate a compromise of a lawsuit already filed by defendant. Being reasonably prepared to go to trial is a reasonable if not indispensable means towards negotiating a fit compromise, and we conclude that plaintiff is therefore entitled to be paid at the agreed hourly rate for all the time he spent while employed exclusively to negotiate a compromise, including time characterizable as spent in preparation for trial. A contract to litigate obliges the lawyer to litigate to end of trial at least; but a contract to attempt to negotiate a compromise obliges only a reasonably exhaustive attempt to compromise. Plaintiff surely discharged that obligation and is entitled to the agreed pay for the period of his employment only to compromise.
It occurred, however, that compromise could not be effected and trial became unavoidable (although a compromise was available, but rejected by defendant, even at time of trial). On August 28, 1973, plaintiff's itemized statement shows, plaintiff did agree to try the lawsuit.
Many charges thereafter were for counsel in other matters for which plaintiff is entitled to pay at the agreed rate. But for those services related to the ongoing lawsuit we must fix the amount by which they have enriched defendant within C.C. 1965 and which she should therefore pay.
Plaintiff had billed and been paid $3,337.90 (all fees except $17.40 billed as costs) by about mid-October. Thus all of the fees now sued for are for work after plaintiff undertook to try the federal court lawsuit, although we find that $295 of fees are billed for services other than in that lawsuit and are therefore recoverable in full.
The other $7,288.50 is not recoverable under the agreement, for the reasons we have previously set forth. The last $1,062.50 charged, which was principally for the two days of the aborted actual trial, is not recoverable at all because, as far as this record shows, it did not enrich defendant. The other $6,226.00 is for about 125 hours from which various depositions, pleadings and memoranda did result, and those items represent an enrichment to defendant because she could use them in the further pursuit of the lawsuit plaintiff was handling. We can be certain that they are not worth zero to defendant, and that they are not worth the 100% of its regular charge that plaintiff claims. We cannot be certain of our rough estimate of their value, but we can be certain that our rough estimate will be more correct than either zero or 100%. Perhaps a successor lawyer would save far more than half of the time he would otherwise *694 have had to spend preparing for, taking and reviewing depositions, since he would need only to review them (although that would presumably take him longer than counsel who had prepared for and taken the depositions). But the successor lawyer might save comparatively little time in studying the case on account of the first lawyer's similar efforts perhaps far less than half of the time the successor would otherwise have had to spend. We conclude, from reviewing the amounts of time spent in specific areas, that because of the availability of plaintiff's work products successor counsel should probably have had to repeat only about half of the time that plaintiff spent prior to trial in reaching plaintiff's level of preparation for trial. We assume that a competent successor could have been employed at a fee based on the same reasonable hourly rate. [2] Thus the work products of plaintiff would enrich defendant by saving her about half of the time successor counsel would otherwise have to charge her for. Since competent successor counsel would presumably otherwise have used as much time as plaintiff did to prepare for trial, the measure of plaintiff's recovery is half of the time that plaintiff spent. We thus allow half of $6,226, or $3,113.

Costs
Defendant client's agreement with plaintiff was to "reimburse you for out-of-pocket expenses." Court reporter charges of $979.50 for depositions and charges totaling $41.15 for long-distance telephone calls and $35.00 for court and other actual out-of-pocket costs are not contested, although they were never separately billed. Defendant does dispute plaintiff's charge of $1,092.60 for 3,642 photocopies made on plaintiff's office copier.
If plaintiff had actually paid $1,092.60 to a third party for photocopies connected with defendant's matters, plaintiff would be entitled to recover such an out-of-pocket expense. But the expense entailed in having an office with a copying machine and its supplies and employees to operate it is not an "out-of-pocket expense".
Webster's Third New International Dictionary defines the adjective "out-of-pocket", when applied to "expenses" or "costs", as "consisting of or requiring an actual cash outlay". Words and Phrases lists no case discussing "out-of-pocket" in our context. We adopt the quoted dictionary definition, as the "common and usual signification" in "general and popular use" which La.C.C. 1946 requires in interpreting the words of a contract. It is an expense for a lawyer to pay for extra space in his office for a copying machine, for the machine itself, for its supplies, and for its operator. But plaintiff presumably already had those expenses before defendant became its client and without detracting from the absolute fairness of attributing part of those expenses to the cost of representing defendant plaintiff did not outlay or commit itself to outlay 30 cents every time it made a copy of some sheet of paper related to defendant's affairs. Therefore plaintiff's ultimate expenses in making copies of documents for defendant were not reimbursable "out-of-pocket expenses" which alone defendant agreed to pay, and they are not recoverable.

Decree
The judgment is amended to award fees of $295 with legal interest from December 6, 1973 (30 days after billing) and $3,113 with interest from date of judgment, plus expenses of $1,055.65 with interest from judicial demand. Plaintiff is to bear all costs of appeal.
NOTES
[1] The opinion that one party "abused" the other, although asserted by each party, is not supported by any recital of the facts constituting the abuse.
[2] We have not commented further on the trial court's exclusion of evidence of the actual cost of employing another lawyer to try the case because lawyer's charges may vary widely.